## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW JANKOWSKI, Derivatively on Behalf of Nominal Defendant VERIZON COMMUNICATIONS INC., | Case No. |
| Plaintiff, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| v. | |
| HANS VESTBERG, MATTHEW ELLIS, CLARENCE OTIS, JR., SHELLYE L. ARCHAMBEAU, ROXANNE S. AUSTIN, MARK T. BERTOLINI, VITTORIO COLAO, MELANIE L. HEALEY, LAXMAN NARASIMHAN, DANIEL H. SCHULMAN, RODNEY E. SLATER, CAROL B. TOMÉ, and GREGORY G. WEAVER, | |
| Defendants, | |
| and | |
| VERIZON COMMUNICATIONS INC., | |
| Nominal Defendant. | |

By and through his undersigned counsel, Plaintiff Andrew Jankowski ("Plaintiff") brings this shareholder derivative action on behalf of Nominal Defendant Verizon Communications, Inc. ("Verizon" or the "Company") and against certain current and former officers and directors of the Company for: (i) violations of Sections 14(a), 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder; (ii) breaches of fiduciary duties; (iii) unjust enrichment; and (iv) waste of corporate assets. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review

and analysis of public filings made by Verizon and other related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on Verizon's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *Meehan v. Verizon Communications Inc., et al.*, Case No. 23-cv-01375 (W.D. Pa.) (the "Related Securities Action"); and (e) review of other publicly-available information concerning Verizon and the Defendants.

## NATURE OF THE ACTION

1.     Plaintiff brings this action derivatively for the benefit of Nominal Defendant Verizon against certain of the Company's current and/or former executive officers and directors aiming to rectify the Defendants' violations of the Exchange Act and breaches of fiduciary duties for issuing false and misleading statements and/or omitting material information in the Company's public filings and proxy statements from approximately February 4, 2020 to the present (the "Relevant Period").[1]

2.     Verizon is a holding company that, acting through its subsidiaries, is one of the world's leading providers of communications, technology, information and entertainment products and services to consumers, businesses and government entities. With a presence around the world, we offer data, video and voice services and solutions on our networks and platforms that are designed to meet customers' demand for mobility, reliable network connectivity, security

---

[1] The materially misleading statements and/or omissions were issued in the Company's financial reports and other public filings and releases from approximately February 4, 2020 to July 26, 2023; however, the wrongs complained of herein continue through to the present as the Company's internal controls remain deficient.

and control.

3.     Throughout the Relevant Period, Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts that: (i) Verizon owns cables around the country that are highly toxic due to being wrapped in lead, and which harm Company employees and non-employees alike; (ii) it faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its ownership of these lead cables and the health risks stemming from their presence around the United States; (iii) it was warned about the damages and risks presented by these cables but did not disclose that they posed a threat to employee safety, to everyday people, and communities around the country; and (iv) as a result, Defendants' statements about its business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

4.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of Verizon's securities, Plaintiff and the Company have suffered significant losses and damages.

**JURISDICTION AND VENUE**

5.     This Court has jurisdiction over this action pursuant to the subject matter of this action pursuant to 28 U.S.C. § 1331 because the claims arise under and pursuant to §10(b) of the Exchange Act and Rule 10(b)-5 promulgated thereunder.

6.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. §1367(a), as they relate to Plaintiff's claims under 15 U.S.C. §78n(a).

7.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(b), because a substantial portion of the transactions and wrongs complained of herein occurred in this District and defendants have received substantial compensation within this District by doing business

here and engaging in numerous activities that had an effect in this jurisdiction.

## THE PARTIES

8.      Plaintiff has been a shareholder during the Relevant Period and has continuously held shares of Verizon common stock to present.

9.      Nominal Defendant Verizon is incorporated in Delaware and its current principal executive offices are located at 1095 Avenue of the Americas, New York, New York 10036. The Company's common stock trades on the NYSE under the symbol "VZ."

10.     Defendant Hans Vestberg ("Vestberg") has served as the Company's Chief Executive Officer ("CEO") since August 2018 and as a member of the Board since June 2018. In addition, Defendant Vestberg has served as the Chairman of the Board since March 2019. For the fiscal years of 2020, 2021, and 2022, Defendant Vestberg received $19,097,582, $20,342,871, and $19,832,750 in total compensation, respectively. Defendant Vestberg is named as a defendant in the Related Securities Action.

11.     Defendant Matthew Ellis ("Ellis") served as the Company's Chief Financial Officer ("CFO") from November 1, 2016 through May 1, 2023. For the fiscal years of 2020, 2021, and 2022, Defendant Ellis received $8,826,268, $9,111,889, and $9,379,303 in total compensation, respectively. Defendant Ellis is named as a defendant in the Related Securities Action.

12.     Defendants Vestberg and Ellis are collectively referred to herein as the "Securities Action Defendants."

13.     Defendant Clarence Otis, Jr. ("Otis") has been a member of the Company's Board since 2006. Defendant Otis is a member of the Audit Committee, the Finance Committee, and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Otis

received $394,000, $370,000, and $370,000 in total compensation, respectively.

14.     Defendant Shellye L. Archambeau ("Archambeau") has been a member of the Company's Board since 2013. Defendant Archambeau is Chair of the Corporate Governance and Policy Committee and a member of the Audit Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Archambeau received $356,000, $336,000, and $328,000 in total compensation, respectively.

15.     Defendant Roxanne S. Austin ("Austin") has been a member of the Company's Board since 2020. Defendant Austin is a member of the Audit Committee and the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Austin received $256,720, $320,000, and $316,000 in total compensation, respectively.

16.     Defendant Mark T. Bertolini ("Bertolini") has been a member of the Company's Board since 2015. Defendant Bertolini is Chair of the Finance Committee and a member of the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Bertolini received $354,000, $332,000, and $332,000 in total compensation, respectively.

17.     Defendant Vittorio Colao ("Colao") has been a member of the Company's Board since 2022 and had previously served on the Board from 2019 to 2021. Defendant Colao is a member of the Corporate Governance and Policy Committee and the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Colao received $334,000, $33,250, and $50,000 in total compensation, respectively.

18.     Defendant Melanie L. Healey ("Healey") has been a member of the Company's Board since 2011. Defendant Healey is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Healey received $329,000, $308,000, and $302,000 in total compensation,

respectively.

19.    Defendant Laxman Narasimhan ("Narasimhan") has been a member of the Company's Board since 2021. Defendant Narasimhan is a member of the Audit Committee and the Corporate Governance and Policy Committee. For the fiscal years of 2021 and 2022, Defendant Narasimhan received $318,870 and $310,000 in total compensation, respectively.

20.    Defendant Daniel H. Schulman ("Schulman") has been a member of the Company's Board since 2018. Defendant Schulman is Chair of the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Schulman received $356,000, $336,000, and $334,000 in total compensation, respectively.

21.    Defendant Rodney E. Slater ("Slater") has been a member of the Company's Board since 2010. Defendant Slater is a member of the Corporate Governance and Policy Committee and the Human Resources Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Slater received $328,000, $308,000, and $304,000 in total compensation, respectively.

22.    Defendant Carol B. Tomé ("Tomé") has been a member of the Company's Board since 2020. Defendant Tomé is a member of the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Tomé received $395,400, $102,000, and $306,000 in total compensation, respectively.

23.    Defendant Gregory G. Weaver ("Weaver") has been a member of the Company's Board since 2015. Defendant Weaver is Chair of Audit Committee and a member of the Finance Committee. For the fiscal years of 2020, 2021, and 2022, Defendant Weaver received $374,000, $350,000, and $350,000 in total compensation, respectively.

24.    Defendants Otis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan,

Schulman, Slater, Tomé, and Weaver are collectively referred to herein as the "Director Defendants.

25.     The Director Defendants, along with the Securities Action Defendants are referred to herein collectively as the "Individual Defendants."

26.     Defendant Verizon, along with the Individual Defendants are referred to herein collectively as the "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

27.     By reason of their positions as officers, directors, and/or fiduciaries of Verizon, and because of their ability to control the business and corporate affairs of Verizon, the Individual Defendants owed, and owe, the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were, and are, required to use their utmost ability to control and manage Verizon in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of Verizon and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

28.     Each director and officer of the Company owes to Verizon and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of fair dealing.

29.     In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's financial and business prospects so that the market price of the Company's stock would be based on truthful and accurate information.

## Duties of the Members of the Audit Committee

30.    Pursuant to the Audit Committee Charter[2] of Verizon, the purpose of the Audit

Committee is to:

> [A]ssist the Board of Directors in its oversight of: (1) the integrity of the
> Corporation's accounting and financial reporting and its systems of internal
> controls, (2) the performance and qualifications of the independent registered
> public accounting firm (including the independent registered public accounting
> firm's independence), (3) the performance of the Corporation's internal audit
> function, and (4) the Corporation's compliance with legal and regulatory
> requirements. Consistent with this oversight function, the Committee shall have
> the authority to conduct investigations into any matters within the Committee's
> responsibilities and, in doing so, have full access to the Corporation's records,
> employees, and independent registered public accounting firm (with or without
> the presence of management). The Committee shall have the authority, to the
> extent it deems necessary or appropriate, to retain, utilize and rely on legal,
> accounting or other advisors for advice and assistance. The Corporation shall pay
> the costs of any such advisors retained by the Committee.

31.    Specifically, the Audit Committee has the following duties, among others, with

respect to the Company's risk management and control:

> 1. Assess and discuss with management the Corporation's significant business
> risk exposures (including those related to cybersecurity, data privacy and data
> security) and management's program to monitor, assess and manage such
> exposures, including the Corporation's risk assessment and risk management
> policies.
>
> 2. Assess the adequacy of the Corporation's overall control environment,
> including controls in selected areas representing financial reporting, disclosure,
> compliance, and significant financial or business risk.
>
> 3. Review reports from the CEO and CFO on any fraud, whether or not material,
> that involves management or other employees who have a significant role in the
> Corporation's internal controls.
>
> 4. Assess the annual scope and plans of the independent and internal auditors.
>
> 5. Report to the Board of Directors on the activities of the Corporation's
> Management Audit Committee.

---

[2] Available at https://www.verizon.com/about/sites/default/files/Audit_Committee_Charter_Oct_
2018.pdf.

32.    The Audit Committee has the following duties, among others, with respect to the

Company's financial reporting and disclosure matters:

> 6. Review and discuss with management and the independent auditor the annual audited financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the opinion of the independent auditor with respect to the financial statements.

> 7. Review and discuss with management and the independent auditor the quarterly financial statements, related footnotes, disclosures made in Management's Discussion and Analysis of Financial Condition and Results of Operations, and the results of the independent auditor's quarterly review of the financial statements.

> 8. Review and discuss with management and the independent auditor any significant events, transactions, changes in accounting estimates, changes in important accounting principles and their application, any major issues as to the adequacy of internal controls and any special audit steps adopted in light of material control deficiencies. The Committee Chair may represent the entire Committee for this purpose.

> 9. Review analyses prepared by management and/or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods, as well as off-balance sheet structures, on the financial statements.

> 10. Review, in conjunction with the Committee's review of the quarterly and annual reports, the process for the CEO and CFO certifications with respect to the financial statements and the Corporation's disclosure and internal controls.

> 11. Review reports from the CEO and CFO on all significant deficiencies in the design or operation of internal controls which could adversely affect the Corporation's ability to record, process, summarize, and report financial data.

> 12. Review and discuss with management the public release of earnings information, as well as financial information and earnings guidance provided to analysts and rating agencies and delegate to the Committee Chair the authority, at the Chair's discretion, to review any such release, information and guidance.

> 13. Recommend to the Board of Directors whether the annual audited financial statements should be included in the Corporation's annual report on Form 10-K.

33.    The Audit Committee has the following duties, among others, with respect to the

Company's internal audit oversight:

14. Review reports from the Internal Audit department on the proposed scope of the audit plan and the process to develop the plan, as well as the program for integration of the independent and internal audit efforts.

15. Review reports from the Internal Audit department on the status of significant findings and recommendations and management's responses to such findings and recommendations.

16. Review the charter, reporting relationship, responsibilities, activities, organizational structure, qualifications and resources of the Internal Audit department and assess the department's performance.

34.     The Audit Committee has the following duties, among others, with respect to the

Company's independent auditor oversight:

17. Based upon a report from the independent auditor at least annually, review (a) the auditor's internal quality-control procedures, (b) any material issues raised by the most recent quality-control review or PCAOB review of the firm, or by any inquiry or investigation by governmental or professional authorities within the preceding five years respecting one or more independent audits carried out by the firm and (c) any steps taken to address any such issues.

18. Ensure that the independent auditor submits, on a periodic basis, a formal written statement delineating all relationships between the independent auditor and the Corporation, consistent with applicable PCAOB requirements for independent auditor communications with audit committees concerning independence; discuss the statement with the independent auditor and evaluate the relationships and services that may affect the auditor's objectivity and independence; and take appropriate action to satisfy itself of the auditor's independence.

19. Ensure that the independent auditor has established a procedure for the rotation, no less frequently than every five years, of the lead (or coordinating) audit partner and of the audit partner responsible for reviewing the audit.

20. Consider, periodically, the rotation of the independent auditor.

21. Review matters related to the conduct of the annual audit, which are required to be communicated by AICPA Statement of Auditing Standards 61 and other generally accepted auditing standards.

22. Conduct the annual discussion with the independent auditor on the quality and acceptability of the Corporation's accounting principles and all alternative

treatments of financial information within generally accepted accounting principles that have been discussed with management, the potential impact of the use of such alternative disclosures and treatments, and the treatment preferred by the independent auditor.

23. Review the independent auditor's management letter.

24. Review with the independent auditor any audit problems or difficulties and management's response.

25. Preapprove all audit and non-audit services to be provided by, and all fees to be paid to, the independent auditor or devise policies delegating pre-approval authority to one or more members of the Committee.

26. Establish policies for the Corporation's hiring of employees or former employees of the independent auditor who were engaged on the Corporation's account.

27. Review and evaluate the qualifications and performance of the independent auditor and the lead (or coordinating) audit partner.

35.    The Audit Committee has the following duties, among others, with respect to the

Company's ethical, legal and regulatory compliance matters:

28. Assess the design, implementation and effectiveness of the Corporation's compliance processes and programs, including the Code of Conduct.

29. Review with management, the independent auditor and the General Counsel, as appropriate, any legal, regulatory or compliance matters that may have a material impact on the Corporation's financial statements or compliance policies, including any correspondence with or other action by regulators or governmental agencies.

30. Assess the Corporation's policies and procedures with respect to Executive Officers' expense accounts and perquisites, including their use of corporate assets and the reporting of those items (taking into consideration the results of any review of these areas by the internal auditors).

31. Assess the Committee's procedures for (a) the receipt, retention, and treatment of complaints received by the Corporation regarding accounting, internal accounting controls or auditing matters, and (b) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

32. Review reports and disclosures of significant conflicts of interest and related

person transactions.

36.    Lastly, the Audit Committee is required to "evaluate annually the processes, activities and effectiveness of the Committee, including the composition, expertise, and availability of the Committee members."

37.    Upon information and belief, the Company maintained versions of the Audit Committee Charter during the Relevant Period that imposed the same, or substantially and materially the same or similar, duties on, among others, the Individual Defendants, as those set forth above.

## **Duties Pursuant to the Company's Code of Code**

38.    The Individual Defendants, as officers and/or directors of Verizon, were also bound by the Company's Code of Conduct (the "Code")[3] which, according to the Code, sets out basic principles to guide the members of the Board of Verizon, who are required to know and conduct themselves in accordance with the Code, as well as applicable laws and regulations, and to avoid the appearance of improper behavior.

39.    Regarding conflicts of interests, the Code states that:

You must avoid any relationships or activity that might impair, or even appear to impair, your ability to make objective and fair decisions when performing your job. When acting on behalf of the company, you must advance the company's legitimate interests when the opportunity to do so arises. If you identify a situation where the company's interests are being harmed, you must report the matter to Verizon Ethics.

You must never use Verizon property or information for personal gain or take personal advantage of any opportunity that arises in your work for Verizon.

You must disclose any potential or actual conflict to Verizon Ethics as soon as you become aware of it.

40.    Regarding personal conflicts of interests, the Code states that:

---

[3] Available at https://www.verizon.com/about/sites/default/files/Verizon-Code-of-Conduct.pdf.

Certain types of personal relationships can create actual or apparent conflicts of interest both internally at Verizon and in our interactions with third parties. Never use your position at the company to improperly advance your personal interests or those of a friend or relative.

Internally, you may not supervise – directly or indirectly – someone with whom you share a close personal relationship, such as anyone in your family or household, or someone with whom you have or had a romantic relationship or other similar relationship. Even if a family member or romantic partner is not in your reporting chain, if you interact with such a person as part of your Verizon work responsibilities, you must avoid any actions at work that could create even the appearance of a conflict of interest. If you are uncertain about what interactions are appropriate, you must contact Verizon Ethics.

Externally, you may not participate in the selection process for, have discretionary authority involving Verizon's business with, or supervise Verizon's relationship with, a company that does business with Verizon if it employs someone with whom you have a close personal relationship or is a company with which you have a business relationship. Exceptions to this restriction are extremely limited and require the approval of Verizon Ethics.

If a family member or person with whom you have a close personal relationship is employed by an entity that does business with Verizon, you cannot interact with that individual about business between Verizon and the outside entity.

41.    Regarding disclosure and accurate record keeping, the Code states that:

We are committed to maintaining and providing truthful information that satisfies all legal requirements. We do not tolerate the falsification or improper alteration of records. You must create and maintain true and accurate records. If you identify any mistakes or discrepancies, no matter how small, you must try to resolve them immediately, and you must promptly notify your supervisor. You may never direct anyone to create or approve a false or misleading record, or intentionally take any action that helps to create a false or misleading record, such as withholding information from someone preparing a record. Company records must be retained according to applicable laws and Verizon's Records Management Policy. You may never destroy, alter, or conceal any record if you have been directed to retain it or if you know – or reasonably believe there is a possibility – of any litigation or any internal or external investigation concerning that record. If you believe a record was intentionally falsified or created to be misleading, or if anyone directed you to violate any section of this policy, you must immediately contact Verizon Ethics.

Our investors and shareholders are key to our success and we are committed to transparency in financial reporting. All disclosures made in financial reports and in public communications must be full, fair, accurate, and understandable. You

may not selectively disclose (even in one-on-one or small meetings) any material information regarding the company. You should be particularly careful not to disclose such information if you make presentations to customers, business providers, investors, or other third parties.

We use auditors to ensure the accuracy of our reporting. You must cooperate with auditors and provide them with complete, accurate, and timely information, and you must never improperly influence or mislead any auditor.

42.    Upon information and belief, the Company maintained versions of the Code during the Relevant Period that imposed the same, or substantially and materially the same or similar duties on, among others, the Individual Defendants, as those set forth above.

### Control, Access, and Authority

43.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Verizon, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Verizon.

44.    Because of their advisory, executive, managerial, and directorial positions with Verizon, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of Verizon.

45.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Verizon and was at all times acting within the course and scope of such agency.

### Reasonable and Prudent Supervision

46.    To discharge their duties, the officers and directors of Verizon were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Verizon were required to, among other things:

(a) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) properly and accurately guide shareholders and analysts as to the true financial and business prospects of the Company at any given time, including making accurate statements about the Company's business and financial prospects and internal controls;

(d) remain informed as to how Verizon conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e) ensure that Verizon was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

## BREACHES OF DUTIES

47.     Each Individual Defendant, by virtue of their position as a director and/or officer, owed to Verizon and its shareholders the fiduciary duties of loyalty and good faith, and the exercise of due care and diligence in the management and administration of the affairs of Verizon, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Verizon, the absence of good faith on their part, and a reckless disregard for their duties to Verizon and its shareholders that the Individual Defendants

were aware or should have been aware posed a risk of serious injury to Verizon.

48.    The Individual Defendants each breached their duties of loyalty and good faith by allowing the Individual Defendants to cause, or by themselves causing, the Company to make false and/or misleading statements that misled shareholders into believing that disclosures related to the Company's financial and business prospects were truthful and accurate when made.

49.    In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Related Securities Action that alleges violations of the federal securities laws. As a result, Verizon has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

50.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with, and conspired with, one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

51.    During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that the Company's business and financial prospects were better than they actually were. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

52.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duties, unjust enrichment, gross mismanagement, and abuse of control; and (b) disguise and misrepresent the

Company's actual business and financial prospects.

53.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

54.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of their overall contribution to and furtherance of the wrongdoing.

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements Issued During the Relevant Period

55.    On February 4, 2020, Verizon issued the following Environmental, Health and Safety Policy (the "EHS Policy"):

# Environmental, Health and Safety Policy

Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society.

Verizon will conduct business in an environmentally and socially responsible manner and provide employees with a safe and healthful workplace. We are committed, through our environmental, health and safety (EHS) management system and supporting programs, to eliminate hazards and reduce EHS risks.

Verizon will provide the resources needed to meet our corporate commitments, fulfill our compliance obligations, and foster a culture of continual EHS improvement.

Verizon employees and everyone who conducts business on our behalf must perform their jobs in a safe and environmentally responsible manner and must comply with all laws, regulatory requirements, and company programs for protecting the environment and human health and safety. Verizon will seek employees' participation and consultation to identify concerns and opportunities for improvement.

Verizon will provide our customers with solutions — through our products and services — which help them improve safety performance, reduce environmental impact, and support our nation's transition to a sustainable, low-carbon economy.

All Verizon employees and those who conduct business on behalf of Verizon are responsible for following this policy. The Environment, Health and Safety organization is responsible for providing direction and support.

For more information about the scope and organization of Verizon's environmental, health and safety management system, please direct inquiries to askEHS@one.verizon.com.

Issued on 02/04/2020

56.     Certain of the statements in the EHS Policy, such as that "Verizon is committed to protecting the environment and the safety and health of its employees, customers, and the communities where we operate. Our commitment goes beyond maintaining compliance with laws, regulations and policies. Verizon's overarching sustainability mission is to use and promote sustainable business practices that reflect our commitment to the economic, environmental, and social responsibilities we have to our employees, customers, shareowners, and society", were materially false and misleading because, at the time the EHS Policy was issued, Verizon owned cables that were covered in toxic lead around the United States, and which were harming employees and non-employees alike.

57.     On February 25, 2021, the Company filed with the SEC its 2020 Annual Report

on Form 10-K for the year ended December 31, 2020 (the "2020 Annual Report"). Attached to

the 2020 Annual Report were certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX")

signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the

disclosure of any material changes to the Company's internal control over financial reporting and

the disclosure of all fraud.

58.     The 2020 Annual Report stated the following, in pertinent part, regarding the

Company's environmental impact:

> To compete effectively in today's dynamic marketplace, we are focused on the
> capabilities of our high-performing networks to drive growth based on delivering
> what customers want and need in the new digital world. During 2020, we focused
> on leveraging our network leadership; retaining and growing our high-quality
> customer base while balancing profitability; enhancing ecosystems in growth
> businesses; and driving monetization of our networks, platforms and solutions.
> ***We are creating business value by earning customers', employees' and
> shareholders' trust, limiting our environmental impact and continuing our
> customer base growth while creating social benefit through our products and
> services***. Our strategy requires significant capital investments primarily to acquire
> wireless spectrum, put the spectrum into service, provide additional capacity for
> growth in our networks, invest in the fiber that supports our businesses, evolve
> and maintain our networks and develop and maintain significant advanced
> information technology systems and data system capabilities. We believe that
> steady and consistent investments in our networks and platforms will drive
> innovative products and services and fuel our growth.[4]

59.     This statement was materially false and misleading because, at the time it was

made, the Company owned cables that were covered in toxic lead, and which harm the

environment as well as employees and non-employees alike. Further, the Company's ownership

of these cables, and failure to disclose their ownership of them to employees and others likely to

be harmed by them, constituted a threat to the Company's reputation and ability to create

business value by earning "customers', employees', and shareholders' trust."

60.     The 2020 Annual Report contained the following portions regarding worker

---

[4] Emphasis has been added unless otherwise noted.

safety:

> In 2020, Verizon employees across the Company came together in new ways in response to the health and humanitarian crisis brought on by the novel coronavirus (COVID-19) pandemic. Soon after COVID-19 was first identified, Verizon took many broad-ranging steps to support our employees and their families so that the Company could continue providing our essential services to our customers and communities. Some of these measures included temporarily moving over 115,000 of our employees to remote work arrangements and temporarily closing nearly 70% of our Company-owned retail store locations or moving to appointment-only store access; limiting our customer-focused field operations for a period of time; ***enhancing safety protocols for employees working outside their homes***; launching a COVID-19 leave of absence policy and expanded family care assistance for employees; and providing additional compensation to employees in front line roles that could not be done from home for a period of time. In an effort to foster transparency and provide support during this unprecedented time, Verizon launched a daily live webcast with current information on the Company's actions to address the impacts of COVID-19 as well as a number of broad ranging resources for employees. In addition, Verizon re-trained over 20,000 frontline employees to temporarily serve in other roles, such as customer service or tele-sales, which not only promoted the health and safety of our employees, but also provided opportunities for learning and career development.

61.     This statement was materially misleading because, while the Company may have provided for safety measures relating to COVID-19, it did not adequately warn or care for employees who were exposed to dangerous levels of toxic lead as a result of handling Company-owned cables that were covered in lead.

62.     On March 29, 2021, the Company filed with the SEC its annual proxy statement on Form DEF 14A (the "2021 Proxy"). The 2021 Proxy solicited shareholders to vote to elect members of the Company's Board and to "[a]pprove, on an advisory basis, Verizon's executive compensation."

63.     Concerning the Company's short-term incentive program in connection with executive compensation, the 2021 Proxy stated that "[w]e are also committed to ***reducing the environmental impact of our operations*** because we believe that it is important for us to be good

stewards of our planet while we continue to serve our customers." Further, the 2021 Proxy noted that "Increased the weight of the ESG metrics included in the corporate performance measures to strengthen our corporate purpose and culture."

64.     However, the 2021 Proxy failed to disclose to investors that the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by "reducing the environmental impact of our operations."

65.     On April 27, 2021, July 28, 2021, and October 26, 2021 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2021, June 30, 2021, and September 30, 2021, respectively (the "1Q21 Report", the "2Q21 Report" and the "3Q21 Report", and collectively, the "2021 Quarterly Reports"). Attached to each of the 2021 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

66.     Each of the 2021 Quarterly Reports contained the following statement, which was also included in the 2020 Annual Report:

> To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. In 2021, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services***. Our strategy requires significant capital investments primarily to acquire

wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

67.    This statement was materially false and misleading for the reasons discussed above.

68.    Then, on February 11, 2022, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

69.    The 2021 Annual Report contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the new digital world. During 2021, we focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. *We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services*. Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that steady and consistent investments in our networks and platforms will drive innovative products and services and fuel our growth.

70.    This statement was materially false and misleading for the reasons discussed above.

71.    On March 28, 2022, the Company filed with the SEC its annual proxy statement

on Form DEF 14A (the "2022 Proxy"). The 2022 Proxy solicited shareholders to vote to elect members of the Company's Board and to "[a]pprove, on an advisory basis, Verizon's executive compensation."

72.    Concerning the Company's short-term incentive program in connection with executive compensation, the 2022 Proxy stated that "[w]e are also committed to *reducing the environmental impact of our operations* because we believe that it is important for us to be good stewards of our planet while we continue to serve our customers." Further, the 2022 Proxy noted that "[c]onsistent with prior years, the [Compensation] Committee also selected diversity and sustainability metrics to reflect Verizon's commitments to promoting diversity among our employees and our business partners and *reducing the environmental impact of our operations*."

73.    However, the 2022 Proxy failed to disclose to investors that the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by "reducing the environmental impact of our operations."

74.    Then, on April 27, 2022, July 28, 2022, and October 25, 2022 the Company filed with the SEC its quarterly reports on Form 10-Q for the periods ended March 31, 2022, June 30, 2022, and September 30, 2022, respectively (the "1Q22 Report", the "2Q22 Report" and the "3Q22 Report", and collectively, the "2022 Quarterly Reports"). Attached to each of the 2022 Quarterly Reports were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the

Company's internal control over financial reporting and the disclosure of all fraud.

75.    Each of the 2022 Quarterly Reports contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we are focused on leveraging our network leadership; retaining and growing our high-quality customer base while balancing profitability; enhancing ecosystems in growth businesses; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning customers', employees' and shareholders' trust, limiting our environmental impact and continuing our customer base growth while creating social benefit through our products and services***. Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that 2022 is a peak year of capital investment for us as we are rapidly deploying C-Band spectrum, which, together with our industry leading millimeter wave deployment, 4G LTE network, fiber infrastructure and other network deployments, will drive innovative products and services and fuel our growth.

76.    This statement was materially false and misleading because, at the time it was made, the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables and failure to disclose their ownership of them to employees and others likely to be harmed by them constituted a threat to the Company's reputation and ability to create business value by earning "customers', employees', and shareholders' trust."

77.    In 2022, the Company posted on its website its 2021 Environmental, Social and Governance Report for the 2021 calendar year (the "2021 ESG Report"). The 2021 ESG Report contained the following statement regarding the Company's handling of waste:

Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 or e-Stewards. ***Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require vendors to provide***

*certificates of recycling for the batteries*. We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste.

78.    This statement was misleading at the time it was made because while Verizon may take steps to protect the public from certain hazardous waste or other materials, including harmful lead-acid batteries, it owns lead-covered cables around the country and was aware that those lead-covered cables harm communities, employees, and non-employees alike.

79.    Then, on February 10, 2023, the Company filed with the SEC its annual report on Form 10-K for the year ended December 31, 2022 (the "2022 Annual Report"). Attached to the 2022 Annual Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

80.    The 2022 Annual Report contained the following statement regarding litigation risk:

> *We are subject to a substantial amount of litigation, which could require us to pay significant damages or settlements*.
> We are subject to a substantial amount of litigation and claims in arbitration, including, but not limited to, shareholder derivative suits, patent infringement lawsuits, wage and hour class actions, contract and commercial claims, personal injury claims, property claims, environmental claims, and lawsuits relating to our advertising, sales, billing and collection practices. In addition, our wireless business also faces personal injury and wrongful death lawsuits relating to alleged health effects of wireless phones or radio frequency transmitters. We may incur significant expenses in defending these lawsuits. In addition, we may be required to pay significant awards or settlements.

81.    This statement was misleading because while it disclosed that the Company faces personal injury lawsuits relating to alleged health effects of wireless phones or radio frequency transmitters, it omitted that it is also at a heightened risk of personal injury lawsuits stemming from harm caused by its toxic lead-covered cables, which could also lead to environmental-related litigation (such as if the toxic lead seeps into a source of drinking water).

82.    The 2022 Annual Report also contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2022, we focused on maintaining our network leadership, including by rapidly deploying C-Band spectrum; retaining and growing our high-quality customer base while balancing profitability in challenging market conditions; and driving monetization of our networks, platforms and solutions. ***We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services***. Our strategy requires significant capital investments primarily to acquire wireless spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. 2022 was a peak year of capital investment for us as we rapidly deployed C-Band spectrum. We believe that this spectrum, together with our industry leading millimeter wave spectrum holding, 4G LTE network and fiber infrastructure, will drive innovative products and services and fuel our growth.

83.    This statement was materially false and misleading because, at the time it was made, the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables and failure to disclose their ownership of them to employees and others likely to be harmed by them constituted a threat to the Company's reputation and ability to, as it itself stated, create business value by earning the trust of stakeholders.

84.    In 2023, Verizon released on its website its Environmental, Social and Governance Report for the 2022 calendar year (the "2022 ESG Report"). The 2022 ESG Report contained the following statement regarding Verizon's efforts to reduce waste, and on responsibly disposing of potentially hazardous waste, such as lead-acid batteries:

**E-waste: reducing, reusing and recycling**
Verizon defines electronic waste, or e-waste, as electronic products and component parts that are at the end of their useful life and/or have been returned by customers. E-waste generated by our business operations includes cell phones, chargers, set-top boxes, network equipment, batteries and associated plastic

26

components. *In 2022, Verizon reused or recycled approximately 43.4 million pounds of e-waste, including 1.6 million pounds of plastic and 2.7 million pounds of lead-acid batteries*.

We strive to divert 100% of e-waste from landfills by reusing or responsibly recycling materials. To the extent practicable, we reuse electronic products and parts internally. When internal reuse is not possible, we market these materials for reuse through approved vendors or work with partners to responsibly recycle them. Verizon's Circular Supply Chain team partners with Corporate Sourcing to incorporate terms into our vendor contracts for the responsible end-of-life management of our products.

Verizon's device trade-in program supports our efforts to repurpose, reuse or recycle all of the devices and accessories that we receive back from consumers. The program lets both Verizon and non-Verizon consumers return qualifying, pre-owned mobile and other electronic devices in exchange for a Verizon credit or gift card. Consumers can also return obsolete devices for recycling. In addition, we refurbish and redistribute to customers our home internet devices for 4G and 5G fixed wireless access and Fios service. Many of Verizon's recycling practices exceed regulatory mandates. We engage e-waste vendors that manage our waste in accordance with high industry standards for environmental stewardship such as R2 and e-Stewards. *Our practice is to require lead-acid batteries from our U.S. operations to be sent to Verizon-approved recycling facilities in the U.S. or Canada and to require our vendors to provide certificates of recycling for the batteries. We regularly audit facilities, including battery smelters, that manage Verizon's hazardous or regulated waste*.

85.    This statement was misleading at the time it was made because while Verizon may take steps to protect the public from certain hazardous waste or other materials, including harmful lead-acid batteries, it owns lead-covered cables around the country and was aware that those cables harm communities, employees, and non-employees alike.

86.    On March 27, 2023, the Company filed with the SEC its annual proxy statement on Form DEF 14A (the "2023 Proxy"). The 2023 Proxy solicited shareholders to vote to elect members of the Company's Board and to "[a]pprove, on an advisory basis, Verizon's executive compensation."

87.    Concerning the Company's short-term incentive program in connection with executive compensation, the 2023 Proxy stated that "[w]e are also committed to *reducing the*

*environmental impact of our operations* because we believe that it is important for us to be good stewards of our planet while we continue to serve our customers." Further, the 2023 Proxy noted that "[c]onsistent with prior years, the [Compensation] Committee also selected diversity and sustainability metrics to reflect Verizon's commitments to promoting diversity among our employees and our business partners and *reducing the environmental impact of our operations*."

88.    However, the 2023 Proxy failed to disclose to investors that the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by "reducing the environmental impact of our operations."

89.    Then, on April 27, 2023, the Company filed with the SEC with the SEC its quarterly reports on Form 10-Q for the period ended March 31, 2023 (the "1Q23 Report"). Attached to the 1Q23 Report were certifications pursuant to SOX signed by Defendants Vestberg and Ellis attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting and the disclosure of all fraud.

90.    The 1Q23 Report contained the following statement:

To compete effectively in today's dynamic marketplace, we are focused on the capabilities of our high-performing networks to drive growth based on delivering what customers want and need in the digital world. In 2023, we are focused on maintaining the reliability and resilience of our network, retaining and growing our high-quality customer base while balancing profitability in challenging market conditions, and driving monetization of our networks, platforms and solutions. *We are creating business value by earning the trust of our stakeholders, limiting our environmental impact and supporting our customer base growth while creating social benefit through our products and services*. Our strategy requires significant capital investments primarily to acquire wireless

spectrum, put the spectrum into service, provide additional capacity for growth in our networks, invest in the fiber that supports our businesses, evolve and maintain our networks and develop and maintain significant advanced information technology systems and data system capabilities. We believe that our C-Band spectrum, together with our industry leading millimeter wave spectrum holding, fourth-generation (4G) Long-Term Evolution (LTE) network and fiber infrastructure, will drive innovative products and services and fuel our growth.

91.     This statement was materially false and misleading for the reasons discussed in above.

92.     The statements contained above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Verizon owns cables around the country that are highly toxic due to being wrapped in lead, and which harm Company employees and non-employees alike; (2) it faces potentially significant litigation risk, regulatory risk, and reputational harm as a result of its ownership of these lead cables and the health risks stemming from their presence around the United States; (3) it was warned about the damage and risks presented by these cables but did not disclose that they posed a threat to employee safety, to everyday people, and communities around the country; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Begins to Emerge**

93.     On Sunday, July 9, 2023, *The Wall Street Journal* released an article entitled "America is wrapped in miles of toxic lead cables." It stated, in pertinent part:

[. . .] Verizon and other telecom giants have left behind a sprawling network of cables covered in toxic lead that stretches across the U.S., under the water, in the

soil and on poles overhead, a Wall Street Journal investigation found. As the lead degrades, it is ending up in places where Americans live, work and play.

The lead can be found on the banks of the Mississippi River in Louisiana, the Detroit River in Michigan, the Willamette River in Oregon and the Passaic River in New Jersey, according to the Journal's tests of samples from nearly 130 underwater-cable sites, conducted by several independent laboratories. The metal has tainted the soil at a popular fishing spot in New Iberia, La., at a playground in Wappingers Falls, N.Y., and in front of a school in suburban New Jersey.

The U.S. has spent decades eradicating lead from well-known sources such as paint, gasoline and pipes. The Journal's investigation reveals a hidden source of contamination—more than 2,000 lead-covered cables—that hasn't been addressed by the companies or environmental regulators. These relics of the old Bell System's regional telephone network, and their impact on the environment, haven't been previously reported.

Lead levels in sediment and soil at more than four dozen locations tested by the Journal exceeded safety recommendations set by the U.S. Environmental Protection Agency. At the New Iberia fishing spot, lead leaching into the sediment near a cable in June 2022 measured 14.5 times the EPA threshold for areas where children play. "We've been fishing here since we were kids," said Tyrin Jones, 27 years old, who grew up a few blocks away.

For many years, telecom companies have known about the lead-covered cables and the potential risks of exposure to their workers, according to documents and interviews with former employees. They were also aware that lead was potentially leaching into the environment, but haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables.
Doctors say that no amount of contact with lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Even without further exposure, lead can stay in the blood for about two or three months, and be stored in bones and organs longer. Risks include behavior and learning problems and damage to the central nervous system in children, as well as kidney, heart and reproductive problems in adults, according to U.S. health agencies.

The Journal's findings "suggest there is a significant problem from these buried lead cables everywhere, and it's going to be everywhere and you're not even going to know where it is in a lot of places," said Linda Birnbaum, a former EPA official and director of the National Institute of Environmental Health Sciences, a federal agency.

***In Coal Center, Pa., medical tests independently sought by the mother of 6-year-old twins, Joyanna and Beau Bibby, and shared with the Journal, showed they had high levels of lead in their blood. The tests were taken a few days after they played in a lot next to their house under a drooping cable***.

In response to the Journal's reporting, [. . .] Verizon and other telecom companies that succeeded Ma Bell said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead, considering the existence of other sources of lead closer to people's homes. They said they follow regulatory safety guidelines for workers dealing with lead.

The companies and an industry group representing them said they would work together to address any concerns related to lead-sheathed cables. "The U.S. telecommunications industry stands ready to engage constructively on this issue," said a spokeswoman for USTelecom, a broadband association that represents companies in the industry.

*       *       *

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

Some former telecom executives said companies believed it was safer at times to leave lead cables in place than remove them, given the lead that could be released in the process.

The lead-covered cable network included more than 1,750 underwater cables, according to public records collected by the Journal. A Journal analysis of the five most densely populated states, and more than a dozen of the most densely populated counties in the nation, identified about 250 aerial cables alongside streets and fields next to schools and bus stops, some drooping under the weight. There are likely far more throughout the country.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. The samples were analyzed for lead content by Pace Analytical Services, an accredited environmental-testing lab. A researcher at the University of Washington who analyzed the chemical fingerprint of lead at some of those sites verified that the lead contaminating the
water and soil likely originated from the cable.

**AMONG THE FINDINGS**

—***Roughly 330 of the total number of underwater cable locations identified by the Journal are in a "source water protection area***," designated by federal regulators as contributing to the drinking-water supply, according to an EPA review performed for the Journal.

—Aerial lead cabling runs alongside more than 100 schools with about 48,000 students in total. More than 1,000 schools and child-care centers sit within half a mile of an underwater lead cable, according to a Journal analysis using data from research firm MCH Strategic Data.

—In New Jersey alone, more than 350 bus stops are next to or beneath aerial lead-covered cables, a Journal analysis of NJ Transit data found.
—Roughly 80% of sediment samples taken next to underwater cables, which the Journal tested, showed elevated levels of lead. It isn't known if the level of leaching is constant; experts say old cables tend to degrade over time.

***Ben Grumbles, executive director of an association of state environmental regulators, called the Journal's findings disturbing. "This is a type of toxic exposure that isn't on the national radar and it needs to be," he said. "There is a need to act and clean it up."***

**AN ANCIENT NETWORK**

American Telephone & Telegraph laid nearly all the cables in question between the late 1800s and the 1960s as it built out telephone service across the U.S. The cables, often containing hundreds of bundled copper wires, had a thick jacket of lead for insulation, to prevent corrosion and to keep out water. For underwater cables, steel cords sometimes surround the lead for further protection.

When technology advanced and companies turned to plastic sheathing and, later, fiber optics, they often left the old lines in place.

With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon. Tracking the current owners of old cables isn't a simple task after decades of deals, and the companies themselves in many instances denied their ownership. The Journal provided lists of cable locations to major telecom providers, which declined to detail cable locations.

To track the underwater cables, the Journal collected more than 40,000 pages of records from federal and state government offices, including applications to the U.S. Army Corps of Engineers to install the cables that were approved more than a century ago. ***Removing Army Corps-approved cables at any time would routinely require a permit or be noted in the original paperwork, officials say. The Journal tally of abandoned lead cables is sure to be an undercount***.

Researchers Seth Jones and Monique Rydel Fortner, from the environmental consulting firm Marine Taxonomic Services, collected lead, soil and water samples at the Journal's request—a process that included diving expeditions at

some locations. They have become experts in lead cables since they discovered them under Lake Tahoe more than 10 years ago and have advocated for their removal. The Environmental Defense Fund, a nonprofit advocacy group, provided guidance and $85,000 to MTS to partly fund its field research for the project.

The Journal found that where lead contamination was present, the amount measured in the soil was highest directly under or next to the cables, and dropped within a few feet—a sign the lead was coming from the cable, experts said.

The Journal didn't find lead in all the locations it tested. The level of contamination can vary in water and soil, depending on environmental and other factors.

The most obvious public-health risks from lead contamination remain from well-known sources such as lead paint, leaded gasoline and lead piping that brings drinking water to homes. The EPA and other agencies have spent billions of dollars to reduce lead in the environment. In 1997, health regulators said average blood lead levels in children and adults had dropped more than 80% since the 1970s.

Yet large numbers of American children continue to show levels of lead in their blood— more than half of those tested, according to a Quest Diagnostics study published in 2021, based on an analysis of test results from more than one million children under age 6. "A new, uncontrolled source of lead like old telephone cables may partly explain" why children continue to have lead in their blood, said Jack Caravanos, an environmental public-health professor at New York University, who assisted the Journal in its research. "We never knew about it so we never acted on it, unlike lead in paint and pipes."

Gordon Binkhorst, an environmental consultant and expert on lead sampling, said he believes cables should be removed because they are "continuing sources of soil and potentially groundwater contamination." Other experts said covering the cables and the area around them could reduce the risk.

Binkhorst reviewed the sampling methods used by the Journal and said they were appropriate techniques for basic testing of whether lead was present in the soil and water near the cables, using a certified environmental testing lab.

*       *       *

In Wappingers Falls, N.Y., about 60 miles north of New York City just off the Hudson River, an aerial lead cable hangs above the perimeter of a town playground, with a jungle gym, a swing set and a basketball court.

Near a "CHILDREN AT PLAY" sign, lead in the soil measured more than 1,000 parts per million, according to Caravanos, the NYU professor.

33

The EPA's recommendations for the levels of lead it believes are generally safe in soil are lower for areas where children play, at 400 parts per million, and higher for other areas, at 1,200 parts per million. (While lead in water is described in parts per billion, lead in soil is described in parts per million, with one part per million equivalent to about one inch in 16 miles.)

Caravanos used an X-ray fluorescence analyzer, or XRF, a device used by scientists to measure elements in soil. At the corner of the playground, the XRF showed lead in soil just under the cable at 850 parts per million.

It doesn't take much lead in soil to elevate a blood level for a child, said Caravanos. "You just need a little dirt on your fingers to put into your mouth and ingest, and you get an elevated blood lead above the CDC level of 3.5."

In West Orange, N.J., a lead-sheathed cable sags over tree-lined sidewalks and driveways for more than one-third of a mile, where children and their parents walk, across the street from Gregory Elementary School. The cable sometimes dips to about 12 feet above the ground.

Caravanos found contaminated soil beneath the cable in multiple spots and registered multiple readings far exceeding the EPA guideline for play areas. Gregory Elementary School is one of 64 schools in New Jersey where the Journal identified aerial lead cables.

\*       \*       \*

**FINGERPRINTING LEAD**

At selected sites, the Journal took the extra step to confirm that lead stemmed from the cables and not another source. Reporters worked with a researcher to perform an isotopic analysis, a procedure that determines a specific fingerprint for the lead involved. The testing by Bruce Nelson, a geochemistry professor at the University of Washington who specializes in the field, linked the lead found in samples most likely to the specific cables—as opposed to, say, lead from a factory or from paint.

\*       \*       \*

At some cable sites, telecom companies disavowed ownership. In Lake Pend Oreille in the Idaho panhandle, a snarl of two lead-covered cables lies abandoned at a spot where children speed by on inner tubes in the summer. The cables sit under a railroad bridge in a prime fishing spot.

A sample of water collected in August at the lake bottom showed lead at 1,250 parts per billion. A water sample taken at the surface in that spot showed lead at

38.8 parts per billion. An isotopic analysis showed that the fingerprint of the lead in the water at the surface matched lead from a telecom cable at that site, and not that of a lakeside slag heap known as Black Rock, the detritus of a lead smelter that had ceased operations by 1913.

A predecessor company to Verizon laid a cable near the site, a U.S. Army Corps record shows. Verizon, Frontier Communications and Ziply Fiber, telecom companies that have variously served this region over the years, say they don't own the cables.

**COAL COUNTRY RISK**

*In Coal Center, Pa., an aerial lead-sheathed cable runs along the street, drooping so low in certain spots that it is nearly within arm's reach. The roughly mile-long cable, from Verizon, runs into neighboring California, Pa., across an entrance to apartment buildings, and near a school bus stop and playground. Some local residents had known about the cable and had been voicing their concerns for nearly a year.*

*Lead found at one of the locations measured 7.5 times the amount the EPA says is safe for play areas, according to a soil sample collected by the Journal. The isotopic analysis by Nelson showed the lead in the soil mirrored the lead from the cable and was unlike the background lead in that area.*

The lead-sheathed cable runs over the property of Shannon Bibby, 36, mother of the 6- year-old twins. This February, her children played under the cable in the lot next to their house, where ground was being dug up for the foundation of a home. *An analysis of soil collected by the Journal from the family's property showed lead at a level more than 40% higher than the recommended level for play areas by the EPA.*

*A borough council member, Bibby had her children's blood tested after learning about the Journal's finding. Capillary tests, or blood pricks, found lead in one child's blood higher than 3.5 micrograms per deciliter.* The other child hit that mark, which is the level at which the CDC recommends seeking medical or environmental follow-up. A subsequent blood test showed non-detectable levels of lead.

It is impossible to say if the twins' initial elevated lead level tests were directly linked to exposure from the cable. The Bibbys' results were below what the EPA model could expect to find in a child playing in soil with the concentrations found at their property, according to Caravanos.

*Bibby said she and other Coal Center residents have been pushing Verizon to take the cable down. Verizon has told them it has working services on the old lead cable. In December, she and other Coal Center borough council members*

*discussed their concerns in the tiny borough hall at the edge of the Monongahela River.*

*"We have to get moving on these cables," said council member Rob Lincavage, who grew up in Coal Center and said it has become one of his goals in life to see the cable removed.*

*"It shouldn't be here," said Bibby. She said the lead should be removed "before something bad happens."*

94.    On this news, Verizon's stock fell $0.76 per share, or 2.11% to close at $35.14 per share on July 10, 2023, on unusually heavy trading volume, damaging investors.

95.    Then, on July 12, 2023, before the market opened, *The Wall Street Journal* released a follow-up article entitled "What AT&T and Verizon knew about toxic lead cables." The article stated, in pertinent part:

[. . .] For decades, [Verizon and other firms] dating back to the old Bell System have known that the lead in their networks was a possible health risk to their workers and had the potential to leach into the nearby environment, according to documents and interviews with former employees.

They knew their employees working with lead regularly had high amounts of the metal in their blood, studies from the 1970s and '80s show. [. . .] Government agencies have conducted inspections, prompted by worker complaints, that led to citations for violations involving lead exposure and other hazardous materials more than a dozen times over four decades, records show.

\*        \*        \*

*Yet the companies haven't meaningfully acted on potential health risks to the surrounding communities or made efforts to monitor the cables, according to historical data, documents and interviews with former executives, safety managers and workers who handled lead. The telecom industry's lead-covered cables have been largely unknown to the public. The industry doesn't have a program to remove or assess their condition. Four former Federal Communications Commission chairs said they weren't aware of lead in phone networks.*

\*        \*        \*

"They knew the risks, but they didn't want to do a lot to mitigate it," said James Winn, who worked as a cable splicer among other jobs for several Bell System

companies for 45 years. Company testing in the 1980s found that he had high levels of lead in his blood, but his manager told him to go back to working with lead shortly after, he said.

A Wall Street Journal investigation has revealed that telecom companies left behind more than 2,000 potentially dangerous lead-covered cables under water, in soil and overhead. Many more are likely to exist.

Journal reporters visited about 300 cable sites around the U.S. and collected roughly 200 environmental samples at nearly 130 of those sites. Roughly 80% of sediment samples taken next to underwater cables showed elevated levels of lead.

Doctors say that no amount of lead is safe, whether ingested or inhaled, particularly for children's physical and mental development. Without further exposure, lead stays in the blood for only about two or three months, but it can be stored in organs longer and in bones even for decades, according to Dr. Philip Landrigan, director of the program for global public health and the common good at Boston College.

Like asbestos, lead must either be sealed away or removed completely to eliminate the risks. USTelecom, a trade group that represents companies in the industry, said "the scientific literature and available studies" on lead-sheathed cables show they aren't a public-health issue or a risk to workers when precautions are used.
The group declined to provide or describe any such studies and literature.

\*      \*      \*

In a written statement, Verizon said it is "taking these concerns regarding lead-sheathed cables very seriously," and is testing sites where the Journal found contamination. It added: "There are many lead-sheathed cables in our network (and elsewhere in the industry) that are still used in providing critical voice and data services, including access to 911 and other alarms, to customers nationwide."

The cables were laid by the original American Telephone & Telegraph, also known as the Bell System, which operated as a group of regional telephone companies starting in the late 1800s. With the breakup of the Bell System's monopoly in 1984, regional phone companies became independent competitors that consolidated over time to form the backbone of modern carriers AT&T and Verizon.

Some lead experts say the cables should be removed, and any contaminated soil should be taken to an appropriate landfill. Removing a lead-sheathed cable could release lead into the environment during the process but some experts say leaving the lead could result in decades-long contamination.

Other experts say less-drastic measures could decrease the risk of contamination, such as covering areas where the cables are exposed. Removing underwater cables would be a far more complicated and costly process that could require an assessment of the risk of disturbing the lead.

Telecommunications companies have wrestled with how to handle the cables. Malone's 2010 presentation noted that removing the cables that were underground wasn't easy. "Extraction of cable from underground duct can release unexpected high levels of lead dust," the presentation said. "Underground cable presents real possibilities for overexposure" to workers removing them.

The oldest cables are typically at the bottom of a manhole or conduit, said retired AT&T executive Bill Smith. Cables from the 1920s could be nearly impossible to pull out, he said. "In the underground, unless you really needed the conduit duct…you would leave it in place," he said.

*        *        *

The question of who might be responsible for any cleanup is complicated, said Brian Berkey, an associate professor of legal studies and business ethics at the University of Pennsylvania's Wharton School. When the cables were installed, if they were a reasonable and responsible decision, and considered safe at the time, the cleanup could ethically be a collective responsibility involving companies and the government, he said.

## LEAD ROOTS

After the invention of the telephone in the 1870s, the first lines to go up were single-line connections strung on poles, connecting one point to another. Tangles of wires soon filled city skies. In the late 19th century, companies began using cables containing bundles of wires that delivered more capacity and better transmission. Sheathing the cable in lead cut electromagnetic noise in the wires and kept water out. By 1940, the majority of the phone network was in lead-covered cables.

There were signs at the dawn of the industry that lead could harm workers. Alice Hamilton, a pioneer of modern industrial medicine and the first female faculty member at Harvard University, included telephone workers among those facing risks from lead in her 1925 book "Industrial Poisons in the United States."

By 1956, the Bell System was using around 100 million pounds of lead a year, according to a Bell document. That's heavier than more than 6,660 male African elephants.

The industry began to deploy more cables that used plastics and alternative metals instead of lead over roughly the next decade, and moved away from installing

new lead cables completely, as technology improved. Workers still maintained the old cables using molten lead and, at times, removed them.

In the 1970s, the U.S. began restricting lead in gasoline and banned lead-based paint in residential homes. The Occupational Safety and Health Administration drafted its first standards on worker exposure to lead and other hazards.

Bell Laboratories, the Bell System's technology and science engine, was a leader in lead research in the 1970s and invented a device that could screen for lead exposure from a drop of blood.

A 1977 Bell study provided a snapshot of high lead levels among female lead-soldering workers at Western Electric, then the manufacturing arm of the Bell System. Based on testing, it estimated that the workers had blood-lead levels in the range of 24 to 45 micrograms per deciliter. Those levels were as high as triple the average level of the population at the time. Bell scientists concluded the workers were "not being exposed to a lead hazard" because a control group of Western Electric office workers also had high estimated lead levels.

Blood tests showed high lead levels in another group of workers—cable splicers, who fixed and maintained cables. A 1978 letter between Communications Workers of America union officials said that AT&T "has confirmed that cable splicers may be exposed to a lead hazard," and that the company "is anxious to test splicers that may have been or are exposed to overdoses of lead."

The average lead levels in the blood of 90 cable splicers was more than 27 micrograms per deciliter, and 29% reported central nervous system symptoms, according to a 1980 paper by Mount Sinai, Bell Labs and New York City's health department.

While regulations and lead bans drove down exposure across the population, there wer still more than 40,000 telecom employees working with lead in 1983, according to a Bell System document. Even though companies stopped deploying new lead-sheathed cables in the 1960s, the existing network still needed to be maintained, and lead-based solder has remained in use.

**SMELTING HEADACHES**

\*         \*         \*

*Between 2007 and 2016, blood-lead test results for 208 Verizon workers showed that 85, or more than 40%, had levels above 3.5 micrograms per deciliter, according to Verizon data shared with the union. That's the current level at which the Centers for Disease Control and Prevention recommends seeking medical or environmental follow-up.*

*Rob Prokopowicz, who retired from Verizon in 2021 after 40 years of working with lead, said he raised concerns with managers about routinely pumping out water from manholes that was potentially contaminated with lead, including in front of schools. He said they told him, "If you don't feel safe, we'll send someone else."*

"When the manholes fill with rainwater and runoff, all the water we are pumping out is contaminated with lead dust," said Prokopowicz, 62.

"For the small percentage of our workforce that may need to work around lead-sheathed cable, we have a robust safety and health program to provide training, materials and resources needed to do so safely," a Verizon spokesman said. The company said its work practices on such cables are based on the available science, legal requirements and guidance from medical and work-safety organizations.

"Verizon's long-standing policy allows for any employee who requests to be tested for lead exposure to do so at any time and without any cost to the employee," he said.

A study last year at Mount Sinai of 20 Verizon workers, with an average tenure of 23 years, showed that 60% had measurable lead in their tibias, said Dr. Rabeea Khan, the study's principal investigator. "The fact that we can detect it in your bones suggests you have had long-term exposure," she said.

Nearly half of the workers in the study, mostly cable splicers, showed lead concentrations of 10 micrograms per gram of bone, indicating increased risk of neurological or biological problems, Khan said. Mount Sinai is planning a broader study later this year.

\*     \*     \*

In response to the Journal's reporting, AT&T, Verizon and a group representing the broader telecom industry said they would work together to address any concerns or issues related to lead-sheathed cables.

96.     Then, on July 14, 2023, before the market opened, *The Wall Street Journal* released an article entitled 'I Was Really Sick, and I Didn't Know From What". The article stated, in pertinent part:

Tracy Fitchhorn worked with lead solder. Her husband, Dan Fitchhorn, spliced lead cables. Her father, Peter Hopkins, handled lead as an installer and repairman. All worked for decades for telecom companies. All are now sick.

The Fitchhorns, like tens of thousands of workers at American Telephone &

Telegraph and its successor companies, were exposed to lead on the job over many years. Current and former workers say they often felt left in the dark about their exposure and how to stay safe.

Some of the workers have neurological disorders, kidney ailments, gastrointestinal issues and cardiovascular problems, illnesses that can be linked to lead exposure. There's no way to determine what triggered specific ailments. Doctors say no amount of lead is safe.

The lead, which those workers handled for decades, is a potential health risk for communities across the U.S. The cables sheathed in the toxic metal are the subject of a Wall Street Journal investigation that has detailed how AT&T, Verizon and other telecom giants left behind a sprawling network of cables, many of which are leaching lead into the environment. Children are especially vulnerable to the effects of lead exposure.

[. . .] Verizon said it has "a robust safety and health program to provide training, materials and resources," and that workers can get lead testing at any time at no cost.

Current and former workers described scant precautions. Many said they learned how to handle lead on the job and weren't given respirators or regular blood lead tests.

Over decades, they wiped hot lead solder to repair cables in New York, fixed aerial lead cables in Pottsville, Pa., and used shaving cream to contain manhole lead dust in Portland, Ore. James Innes said his taste changed, which can be a sign of lead exposure.

The old Bell System of phone companies had an embedded medical team, with medical directors and nurses who took blood tests at physicals for workers. They kept detailed medical records. [. . .]

*A study conducted in the 1970s at New York's Mount Sinai hospital of 90 Bell System cable splicers showed "a high lead content in their blood," with 10 "in danger of suffering medical and/or physical deterioration if they continue on their jobs," according to letters among union officials. A small study last year of lead in Verizon workers' bones showed that exposures continued.*

AT&T and Verizon declined to comment on the studies.

*Tommy Steed removed lead underground cables in the Bronx in the 1980s and said he often vomited after eating breakfast. He said he never got his blood test results from Nynex, now part of Verizon, despite repeated requests.* The state health department later provided them, showing high levels of lead. Nynex "didn't try to get me any remedial help," said Steed, now chairman of the

Association of BellTel Retirees, which advocates for former workers.

97.     The article profiled Tom Killeen, a former cable splicer for, among other companies, Verizon. The article stated "Killeen has chronic headaches, memory loss and difficulty breathing. His first wife had two miscarriages. His daughter suffered from childhood heart problems and has been diagnosed with ADHD. Those conditions can be linked to lead exposure. Mr. Killeen stated, "*I was coming home every day and holding the baby, not thinking there is lead dust all over you*."

98.     The article also profiled Tommy Steed, a former cable splicer and lineman for, among other companies, Verizon. The article stated that "Steed's blood-lead level was 43 micrograms per deciliter in May 1988 and 39 micrograms two months later, according to New York Health department records. The average level for the U.S. population at the time was 2.8 micrograms per deciliter, according to the Centers for Disease Control and prevention." Mr. Steed stated "*[a]t the height of my lead poisoning, I was really sick, and I didn't know from what*."

99.     Finally, it profiled James Innes, a former Cable Splicer for, among other companies, Verizon. Mr. Illness was reported as having "[d]ecades of gastrointestinal problems", and was quoted as saying "*[y]ou were creating a kind of powder from shaving the lead sheath, and every now and then you'd get a sweet taste in your mouth from inhaling the lead*."

100.    On this news, the price of Verizon stock declined by $0.63 per share, or 1.81%, to close at $34.01 on July 14, 2023.

101.    Then, on July 17, 2023, during market hours, *The Wall Street Journal* released an article entitled "Environmental Groups Ask EPA to Shield Public From Abandoned Lead Cables."

The article stated, in pertinent part:

> Three environmental groups called on the Environmental Protection Agency to shield the public from the release of lead from cables left behind by telecom companies.

> In a letter Monday to the EPA, the groups asked the federal agency to ensure the "immediate removal" of all abandoned aerial lead-covered cables hung up on poles and lead infrastructure accessible to children from the ground. The groups also asked the EPA to assess the risks of underwater cables, giving priority to those in areas the regulator designates as important to protect drinking water supply.

> A Wall Street Journal investigation revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing showed that dozens of spots registered lead levels exceeding EPA safety guidelines.

> "Without EPA intervention, we expect that the risk posed by the cables will increase as they further deteriorate and release lead into the environment," according to the letter by the three nonprofit organizations, the Environmental Defense Fund, Clean Water Action and Below the Blue.

> The Journal used testing including isotopic analyses and control sampling to confirm that the contaminating lead in some locations most likely came from the cables. Below the Blue's co-founders, who also work at Marine Taxonomic Services, helped the Journal with environmental sampling for its investigation. The Environmental Defense Fund provided guidance and $85,000 to Marine Taxonomic Services to partly fund its field research for the project.

> The EPA and its administrator, Michael S. Regan, didn't immediately respond to a request for comment.

> The Journal found lead leaching into soil directly underneath aerial lead cables, according to test results by independent accredited laboratories. The Journal identified about 250 aerial lead cables alongside streets and fields next to schools and bus stops. There are likely far more throughout the country.

> "If still in use, they should be protected to prevent leaching and abrasion from the weather, marked as lead-sheathed, and taken out of service as soon as possible, followed by removal," according to the letter, which was viewed by the Journal. "EPA should also ensure surface soil contaminated by the aerial cables is removed or permanently covered."

> Roughly 330 underwater cable locations identified by the Journal are in a "source water protection area," according to an EPA review performed for the Journal.

The groups appealed to Regan to use the agency's authority under the "Superfund" law and the Safe Drinking Water Act to investigate the findings.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, said they don't believe cables in their ownership are a public health hazard or a major contributor to environmental lead. They declined to provide a full accounting of the number of lead cables in their networks to the Journal. They said they would work together to address any concerns related to lead cables.

Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases. The Safe Drinking Water Act allows the agency to take actions to protect health when informed of a contaminant "which is present in or is likely to enter a public water system or an underground source of drinking water" and may present "an imminent and substantial endangerment" to health.

Lead from cables and from junction boxes where cables are spliced is "accessible to the public from the ground with many near playgrounds, schools, child-care facilities, and greenways where inquisitive children may be exposed," the letter said.

Following the Journal investigation, a Wall Street analyst estimated it could cost $59 billion to remove all the lead cables nationwide.

Noting the EPA's limited resources, the groups urged the agency to tap telecom companies responsible for the most lead cables "to support the assessment and actions needed to protect the public from potential exposure."

In a congressional hearing on Thursday, Rep. Patrick Ryan called on the EPA to compel a cleanup of any contamination caused by the cables. In the hearing, the New York Democrat cited a playground where the Journal found a lead cable leaching in Wappingers Falls, N.Y., which is in Ryan's district.

"Does the EPA plan on compelling clean up action from these telecom companies?" Ryan asked Radhika Fox, assistant administrator for the EPA's Office of Water.

Fox said the EPA is looking carefully at the information in the Journal articles and is "coordinating with the FCC [Federal Communications Commission] on this so we are happy to follow up in the coming weeks."

102.    On this news, the price of Verizon stock declined by $2.55 per share, or 7.49%, to close at $31.46 per share.

103.    Then, on July 26, 2023, after the market had closed, *The Wall Street Journal* released an article entitled "Justice Department and EPA Probe Telecom Companies Over Lead Cables." The article stated, in pertinent part:

> The Justice Department and Environmental Protection Agency are investigating the potential health and environmental risks stemming from a sprawling network of toxic lead-sheathed telecom cables across the U.S.
>
> The Justice Department's civil inquiry, by the U.S. attorney's office for the Southern District of New York, is in preliminary stages and focuses partly on whether telecom companies had knowledge of the potential risks to their workers and future environmental impact when they left behind the lead cables, according to a person familiar with the inquiry.
>
> The EPA's enforcement office, using the agency's authority under the "Superfund" law, on Wednesday directed [Verizon] to provide inspections, investigations and environmental sampling data, including future testing plans, about their lead cables and related lead infrastructure within 10 days. Under the EPA's Superfund law, known as the Comprehensive Environmental Response, Compensation and Liability Act, the agency can compel or undertake major environmental cleanups in certain cases.
>
> A Wall Street Journal investigation recently revealed that AT&T, Verizon and other telecom companies have left behind more than 2,000 toxic lead cables on poles, under waterways and in the soil across the U.S. Journal testing near such cables showed that dozens of spots registered lead levels exceeding EPA safety guidelines.
> The EPA takes "the issues raised in these articles very seriously and will move expeditiously under our statutory authorities to protect the public from potential legacy pollution," the agency said in a statement.
>
> *       *       *
>
> Verizon said it hasn't been contacted by the Justice Department. A Verizon spokesman said: "As we have said from the beginning, we remain committed to the factual and scientific based analysis of the issues. We will continue to have a proactive and constructive dialogue with the EPA as we jointly work to better understand the facts and consider any potential actions."
>
> *       *       *
>
> The EPA sought data from Verizon on three lead-sheathed cable sites, and said it would begin independent sampling in Coal Center, Pa., and West Orange, N.J., and coordinate with New York state to review samples in Wappingers Falls, N.Y.,

45

all locations cited in the Journal articles.

The EPA said a priority would be "evaluating areas with vulnerable communities and sites closely linked with children, such as schools and playgrounds." The EPA said its Office of Land and Emergency Management and regional offices are coordinating with state environmental agencies to assess potential contamination at the sites identified by the Journal.

\*     \*     \*

[. . .] Current and former workers at telecom companies stemming from Ma Bell said they learned lead work on the job and didn't receive respirators or regular blood testing, the Journal has reported.

In response to the Journal's reporting, AT&T, Verizon and USTelecom, an industry group, have said they don't believe cables in their ownership are a public-health hazard or a major contributor to environmental lead. They said they follow regulatory safety standards for workers dealing with lead.

In a statement Wednesday, USTelecom said the industry "prioritizes the health and safety of our communities and workers" and continues to "engage with policymakers on this important matter."

\*     \*     \*

On Tuesday, Verizon Chief Financial Officer Tony Skiadas said in an earnings call that "it's far too soon" to project the financial impact that aging lead-sheathed cables might have on the telecom giant. Verizon said lead-clad cable makes up a small percentage of the less than 540,000 miles of cables in its copper-wire network, though that accounting excludes two previously acquired companies with records the company is still reviewing.

Wall Street research analysts have estimated that lead cables make up roughly 15% to 20% of Verizon's legacy footprint, totaling at least 81,000 miles of lead.

Last week, Gov. Kathy Hochul directed three state departments to "immediately investigate" lead cabling in New York, directing telecom providers to provide an inventory of all lead cable locations in the state. Hochul also directed state inspectors to conduct sampling for lead in the Wappingers Falls playground where a lead cable and contamination were identified by the Journal.

"We will hold the telecommunication companies responsible and take swift action to remediate any problems," Hochul said in a statement.

Rep. Pat Ryan, a New York Democrat, wrote to Verizon, AT&T and USTelecom demanding they remove the lead cables. He also asked the companies how many

miles of lead-sheathed cables they are responsible for, and about any plans to protect workers, provide access to blood and bone testing for lead, and remediate any risk.

The Manhattan U.S. attorney's office in recent years has brought a series of civil cases related to alleged environmental wrongdoing. In 2021, the office announced a settlement with Toyota Motor, in which the company paid a $180 million civil penalty for failing to comply with Clean Air Act reporting requirements. The company acknowledged that for a decade it either failed to file required emissions reports or filed them late.

104.    On this news, the price of Verizon stock declined by $0.79 per share, or 2.30%, to close at $33.55 per share on July 27, 2023.

105.    As a result of Defendants' wrongful acts and omissions, and the precipitous declines in the market value of the Company's securities, the Company and its shareholders have been damaged.

## DAMAGES TO THE COMPANY

106.    Verizon has been, and will continue to be, severely damaged and injured by the Defendants' misconduct.  As a direct and proximate result of the Defendants' conduct, Verizon has been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a.    costs incurred in compensation and benefits paid to Defendants that breached their fiduciary duties and violated federal securities laws;

    b.    substantial loss of market capital;

    c.    costs already incurred and to be incurred defending the Related Securities Action and;

    d.    any fines or other liability resulting from the Company's violations of federal law.

107.    In addition, Verizon's business, goodwill and reputation with its business partners, regulators and shareholders have been gravely impaired.  The credibility and motives of

management are now in serious doubt.

108.     The wrongdoing complained of herein has irreparably damaged Verizon's corporate image and goodwill.  For at least the foreseeable future, Verizon will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Verizon's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.     Plaintiff brings this action derivatively in the right and for the benefit of Verizon to redress injuries suffered, and to be suffered, by Verizon as a direct result of violations of federal securities laws by the Defendants.  Verizon is named as a Nominal Defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

110.     The Board of Verizon, at the time this action was commenced, consisted of Defendants Vestburg, Otis, Archambeau, Austin, Bertolini, Colao, Healey, Narasimhan, Schulman, Slater, Tomé, and Weaver, a total of twelve (12) individuals.

111.     Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Verizon Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their scheme and false and misleading statements and/or omissions of material adverse facts which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

112.     Each of the Director Defendants were responsible for reviewing and approving the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period. By authorizing the false and misleading statements and material

omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

113.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

**Demand is Futile as to Defendant Vestberg Because of His
Principal Professional Occupation as the Company's CEO**

114.    Defendant Vestberg is the Company's CEO and has served in his position as CEO since August 2018. Defendant Vestberg is also a member of the Board. In his role as CEO of the Company for the fiscal year 2022, Defendant Vestberg received $19,832,750 in total compensation. The Company does not claim that Defendant Vestberg is an independent director and because his primary source of income and primary employment is his employment as CEO of Verizon and his professional reputation is inextricably bound to his role at Verizon. Defendant Vestberg is incapable of acting independently and demand is futile upon him.

**Demand is Futile as to the Members of the Audit Committee**

115.    Demand is futile as to Defendants Weaver, Archambeau, Austin, Narasimhan, and Otis (the "Audit Committee Defendants") as members of the Audit Committee during the Relevant Period for their knowing failure to fulfill their responsibilities.

116.    The Board adopted an Audit Committee Charter, setting forth the responsibilities of the Audit Committee. The duties and purpose of the Audit Committee are set forth *supra*.

117.    Upon information and belief, in their capacity as members of the Audit Committee, the Audit Committee Defendants were privy to specific information related to the

Company's business, operations, and prospects, which would reasonably put them on notice that the statements set forth above in the Company's public filings were materially false and misleading when made.

118.    The Company's public filings concerning the Company's business and prospects during the Relevant Period contained materially misleading information and/or omitted material information. In their capacity as members of the Audit Committee, the Audit Committee Defendants were charged with ensuring that these reports did not contain such materially misleading information.  By allowing documents to be filled with misleading information, the Audit Committee Defendants face a sufficiently significant likelihood of liability so as to render them interested.    Accordingly, the Audit Committee Defendants cannot adequately independently consider a demand.

## Demand is Futile as to the Director Defendants

119.    Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the Company's Board would be futile, and therefore, excused.  This is because a majority of the Board faces a substantial likelihood of liability as a result of their knowing toleration of the above described false and misleading statements and omissions of material adverse facts, which render them unable to impartially consider a demand to pursue the wrongdoing alleged herein.

120.    Upon information and belief, in their capacity as members of the Company's Board, the Director Defendants were privy to specific information related to the Company's business and financial prospects, which would reasonably put them on notice that the statements they were making were in fact false and misleading.

121.    Each of the Director Defendants were responsible for reviewing and approving

the Company's public statements made in press releases and financial filings with the SEC throughout the Relevant Period.  By authorizing the false and misleading statements and material omissions and described above during the Relevant Period concerning the Company's business and prospects, each of the Director Defendants knowingly faces a substantial likelihood of liability for their participation in the illicit acts alleged herein.

122.    Accordingly, the Director Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartiality to consider a demand to sue themselves in the present action.

### COUNT I

**Against the Individual Defendants for Violations of Section 14(a) of the Exchange Act**

123.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

125.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or

which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

126.    Under the direction and watch of the Individual Defendants, the 2021, 2022, and 2023 Proxy Statements (the "Proxy Statements") failed to disclose to investors that the Company owned cables that were covered in toxic lead, and which harm the environment as well as employees and non-employees alike. Further, the Company's ownership of these cables, and failure to disclose their ownership of them to employees and others likely to be harmed by them, constituted a threat to the Company's reputation and ability to create business value by "reducing the environmental impact of our operations."

127.    The Proxy Statements were also materially misleading because the facts show that the Board and its committees utterly failed to implement controls to effectively oversee conduct risk relating to the Company's core business, operations and prospects in relation to the conduct alleged herein.

128.    The Individual Defendants knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the Proxy Statements, including but not limited to, the re-election of the Company's directors.

129.    The Company was damaged as a result of the Individual Defendants material misrepresentations and omissions in the Proxy Statements.

130.    Plaintiff on behalf of Verizon has no adequate remedy at law.

## COUNT II

**Against the Securities Action Defendants for
Contribution Under Section 10(b) of the Exchange Act,**

**Rule 10b-5 Promulgated Thereunder, and/or Section 20(a) of the Exchange Act**

131.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

132.    As a result of the conduct and events alleged above, Verizon has been named as a defendant in the Related Securities Action brought on behalf of Verizon shareholders in which it is a joint tortfeasor in claims brought under Section 10(b) of the Securities and Exchange Act and Rule 10(b)-5 promulgated thereunder.

133.    Federal law provides Verizon with a cause of action against other alleged joint tortfeasors under Rule 10b-5.  In particular, under the Supreme Court's decision in *Musick, Peeler & Garrett v. Employers Insurance of Wausau*, 508 U. S. 286, Verizon has a federal law right of contribution against joint tortfeasors under Rule 10b-5.  Section 21D(f) of the Securities and Exchange Act further sets forth specific provisions entitling Verizon to contribution against all joint tortfeasors under Rule 10b-5, regardless of whether they have been named as defendants in the currently pending Related Securities Action, and sets forth specific rules regarding the determination of claims for such contribution.

134.    Accordingly, Plaintiff, on behalf of Verizon, hereby claims contribution against the Securities Action Defendants, each of whom has been named in the currently pending Related Securities Action as a joint tortfeasor with Verizon under Rule 10b-5, or if joined in such actions, would be liable for the same damages as Verizon.

135.    Verizon claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

**Allegations Regarding the Securities Action Defendants**

136.    Throughout the Relevant Period, the Securities Action Defendants caused the

Company to issue false and misleading statements and/or omit material information in public statements and/or Company filings concerning the Company's business and financial prospects. These statements were materially misleading to persons who purchased Verizon securities during the Relevant Period.

137.    The plaintiffs in the Related Securities Action allege that they relied, directly or indirectly, upon these false statements and misleadingly omissive disclosures in purchasing Verizon securities, and, as a result, suffered damages because value of their investments was distorted by the false and materially omissive statements, and they purchased such securities at such distorted prices.

138.    The damages suffered by said investors were caused by reason of the fact that (i) they were induced to purchase said securities by the false and misleading statements alleged herein, and (ii) the reveal of the true nature of the Company's business and prospects resulted in the decrease in price of its securities, causing the value of shareholders investments to drop.

139.    The plaintiffs in the Related Securities Action were unaware of the false and misleading nature of said statements and omissive disclosures.

140.    When the Securities Action Defendants signed off on or made the false statements and omissive disclosures detailed herein, they had actual knowledge that they were false and misleading.  As alleged in detail herein, due to their positions as employees and/or directors of Verizon, the Securities Action Defendants were privy to information regarding the Company's business and financial prospects and would have been aware that the statements made were in fact false and misleading when made.

141.    Accordingly, the Securities Action Defendants are liable for damages under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and, if Verizon were

to be held liable in the Related Securities Action, the Securities Action Defendants would be liable to it for contribution. Plaintiffs hereby derivatively claim such right of contribution on behalf of Verizon.

### Allegations Regarding the Securities Action Defendants as Control Persons

142. In Verizon as alleged above, the Securities Action Defendants were acting as authorized agents of Verizon in their roles as directors and/or employees. Because of their positions of control and authority as senior officers and/or directors, the Securities Action Defendants were able to, and did, control the contents of the various reports, press releases and public filings disseminated by the Company throughout the Relevant Period, as alleged herein.

143. The Securities Action Defendants were "controlling persons" of Verizon within the meaning of Section 20(a) of the Exchange Act, and, accordingly, the Securities Action Defendants could be held liable to the plaintiffs in the Related Securities Action. Were the Company to be held liable in said Related Securities Action, the Securities Action Defendants would be liable to it for contribution.

144. Plaintiff hereby derivatively claims such right of contribution on behalf of Verizon.

### COUNT III

### Against the Individual Defendants for Breaches of Fiduciary Duty

145. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

146. The Individual Defendants owed and owe Verizon fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe Verizon the highest obligation of good faith, loyalty, and due care.

147.    The Individual Defendants have violated and breached their fiduciary duties of good faith, loyalty, and due care by causing or allowing the Company to disseminate to Verizon shareholders materially misleading and inaccurate information through the Company's SEC filings throughout the Relevant Period.  These actions could not have been a good faith exercise of prudent business judgment.

148.    During the course of the discharge of their duties, the Individual Defendants knew or recklessly disregarded the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused Verizon to engage in the conduct complained of herein which they knew had an unreasonable risk of damage to the Company, thus breaching their duties owed to Verizon and its shareholders.  As a result, the Individual Defendants grossly mismanaged the Company.

149.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

150.    Plaintiff, on behalf of Verizon, has no adequate remedy at law.

## COUNT IV

### Against the Securities Action Defendants for Unjust Enrichment

151.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

152.    By his wrongful acts and omissions, the Securities Action Defendants were unjustly enriched at the expense of and to the detriment of Verizon.

153.    The Securities Action Defendants were unjustly enriched as a result of the compensation they received while breaching their fiduciary duties owed to Verizon.

154.    Plaintiff, as a shareholder and representative of Verizon, seeks restitution from the Securities Action Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Securities Action Defendants from their wrongful conduct and breaches of fiduciary duty.

155.    Plaintiff, on behalf of Verizon, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Waste of Corporate Assets

156.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

157.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue. It resulted in continuous, connected, and ongoing harm to the Company.

158.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, among other things: (a) paying excessive compensation and bonuses to certain executive officers; (b) awarding self-interested stock options to certain officers and directors; and (c) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Related Securities Action.

159.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

160.    Plaintiff, on behalf of the Company, has no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Verizon and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Verizon the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Verizon and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Verizon and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

(1) a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

(2) a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

D.    Determining and awarding to Verizon exemplary damages in an amount necessary to punish Defendants and to make an example of Defendants to the community according to proof at trial;

E.    Awarding Verizon restitution from Defendants, and each of them;

F.    Awarding Verizon Contribution from the Securities Action Defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 12, 2023                    Respectfully submitted,

                                           */s/ Joshua M. Lifshitz*
                                           Joshua M. Lifshitz
                                           **LIFSHITZ LAW PLLC**
                                           1190 Broadway
                                           Hewlett, New York 11557
                                           Telephone: (516) 493-9780
                                           Facsimile: (516) 280-7376

                                           *Attorneys for Plaintiff*